## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JEREMY MARTIN,

      Plaintiff,

vs.                                                                      No. CIV 14-1011 JB/GBW

CITY OF ALBUQUERQUE, a
municipal corporation, and
PABLO PADILLA, in his individual
capacity,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Padilla's Motion for Summary

Judgment Based on Qualified Immunity, filed April 10, 2015 (Doc. 25)("Motion").  The Court

held a hearing on October 9, 2015.  The primary issue is whether Defendant Pablo Padilla, a

police officer with the Albuquerque Police Department in Albuquerque, New Mexico, is entitled

to qualified immunity when he allegedly kneed Plaintiff Jeremy Martin's groin and threw him to

the ground while attempting to arrest him.  Because the parties dispute whether Padilla struck

Martin in the groin, the reasonableness of Padilla's use of force is disputed and the Court cannot

properly grant summary judgment.  Accordingly, the Court will deny Padilla's Motion regarding

Martin's claims that Padilla's actions violated his Fourth Amendment rights.

## <u>FACTUAL BACKGROUND</u>

On April 25, 2014, Martin was driving a vehicle in Albuquerque when Padilla, "who was

on duty and acting in his capacity as a police officer at the time," stopped Martin for traffic

violations.[1] <u>Jeremy Martin v. City of Albuquerque</u>, 2014, D-202-CV-2014-06580, Complaint for Violation of Civil Rights and Tort Claims ¶¶ 7-8, at 2, filed in the County of Bernalillo, Second Judicial District Court on October 21, filed in federal court November 6, 2014 (Doc. 1-2)("Complaint")(setting forth this fact). <u>See</u> Defendant Padilla's Answer to Plaintiff's Complaint for Violation of Civil Rights and Tort Claims ¶ 7, at 2, filed November 24, 2014 (Doc. 7)("Padilla's Answer")(not disputing this fact); The City of Albuquerque's Answer to Complaint for Violation of Civil Rights and Tort Claims ¶¶ 7-8, at 2, filed November 17, 2014 (Doc. 4)("City's Answer"). <u>See</u> Motion ¶ 1, at 3 (setting forth this fact)(not disputing this fact); Plaintiff's Response to Defendant Padilla's Motion for Summary Judgment Based on Qualified Immunity at 3 (not disputing this fact), filed April 24, 2015 (Doc. 29)("Response"). Padilla instructed Martin to exit his vehicle, which Martin did. <u>See</u> Complaint ¶ 10, at 2 (setting forth this fact); Padilla's Answer ¶ 9, at 2 (not disputing this fact); City's Answer ¶ 10, at 2 (not disputing this fact). Martin "admitted to drinking three beers." Motion ¶ 2, at 3 (setting forth this fact). <u>See</u> Response at 3 (not disputing this fact).

Padilla repeatedly directed Martin to sit down, but Martin refused. <u>See</u> Motion ¶ 3, at 3 (setting forth this fact); Response at 3 (not disputing this fact). During a period of approximately two minutes, Padilla asked Martin to sit down "more than thirty times." Motion ¶¶ 4-5, at 3 (setting forth this fact). <u>See</u> Response at 3 (not disputing this fact). Martin "refused to obey Defendant Padilla's instructions." Motion ¶ 6, at 3 (setting forth this fact). <u>See</u> Response at 3 (not disputing this fact). Despite his failure to sit down, Martin never exhibited any signs of

---

[1]Because the Motion and Response contain limited facts, the Court will also take its facts from the undisputed facts in the Complaint and Answer.

aggression, never wielded a weapon, kept his hands in plain sight, and repeatedly attempted to have a dialogue with Padilla.  See Response ¶ 2, at 3 (setting forth this fact).[2]

Padilla then attempted to arrest Martin without warning him that he was doing so, leading to a physical altercation.  See Motion ¶ 7, at 3 (setting forth this fact).[3]  Padilla pushed Martin into the side of Martin's vehicle.  See Response ¶ 3, at 3 (setting forth this fact).[4]  Immediately

---

[2]Padilla argues that Martin's "self-serving interpretation of the video does not create a material dispute of fact" and that the Court should "view the facts in the light depicted by the videotape."  Response at 3.  The United States District Court for the District of New Mexico's local rules of civil procedure provide:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Padilla's assertion does not specifically controvert Martin's factual assertion.  See D.N.M.LR-Civ. 56.1(b).  Moreover, the Court's review of the video evidence substantiates Martin's assertions.  See Lapel Camera Videotape (Padilla) filed April 10, 2015 (Doc. 25).  Accordingly, the Court deems Martin's factual assertion undisputed.

[3]The parties dispute how the altercation arose.  Padilla asserts that he attempted to place Martin in handcuffs.  See Motion ¶ 7, at 3.  Martin asserts that Padilla assaulted him before attempting to place him in handcuffs.  See Response ¶ 1, at 3.  He further states that Padilla "never said anything relating to handcuffs prior to attacking" him.  Response ¶ 1, at 3.  The Court has reviewed the evidence and determined that the video substantiates Padilla's factual assertion that he was attempting to arrest Martin, but it does not show that Padilla attempted to place Martin in handcuffs before he pushed him against the truck.  Accordingly, the Court deems it undisputed that Padilla attempted to arrest Martin when the physical dispute arose.  See Scott v. Harris, 550 U.S. 372, 380 (2007)(stating that, when opposing parties tell two different stories, one of which the record blatantly contradicts, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment).

[4]Padilla argues that Martin's "self-serving interpretation of the video does not create a material dispute of fact" and that the Court should "view the facts in the light depicted by the videotape."  Response at 3.  Padilla's assertion does not specifically controvert Martin's factual assertion.  D.N.M.LR-Civ. 56.1(b).  Moreover, the Court's review of the video evidence reveals that Padilla pushed Martin up against side of the vehicle.  See Lapel Camera Videotape at 2:25-30.

after Padilla pushed Martin into the vehicle, they engaged in a physical struggle and Martin

yelled, "Don't kick me in the nuts mother-fu****."  Motion ¶ 8, at 3 (setting forth this fact).  See

Response ¶ 2, at 3 (not disputing this fact).[5]  The video evidence does not show Padilla kicking

or striking Martin's groin area.  See Motion ¶ 9, at 3 (setting forth this fact); Response at 3 (not

disputing this fact).  Nevertheless, after pushing Martin into the vehicle, Martin clutched his

groin area and exclaimed: "You kicked me in the nuts!"  Response ¶ 4, at 4 (setting forth this

fact).[6]  Padilla then threw Martin face-first into the pavement as he yelled: "Get on the ground!"

See Response ¶ 5, at 4 (setting forth this fact).[7]  Padilla arrested Martin, "accusing him of various

misdemeanor offenses,"[8] and booked him in the Metropolitan Detention Center.  Complaint ¶ 18,

at 3 (setting forth this fact); Response ¶ 7, at 4 (setting forth this fact); City's Answer ¶ 18, at 3

(not disputing this fact).

---

[5]Martin does not dispute that he uttered this phrase, but he clarifies that he did not use any profanity until after "Padilla attacked him."  Response ¶ 2, at 3.

[6]Padilla argues that Martin's "self-serving interpretation of the video does not create a material dispute of fact" and that the Court should "view the facts in the light depicted by the videotape."  Response at 3.  Padilla's assertion does not specifically controvert Martin's factual assertion.  See D.N.M.LR-Civ. 56.1(b).  The Court's review of the video evidence reveals that Martin made that statement.  See Lapel Camera Videotape at 2:29-33 (Martin).

[7]Padilla argues that Martin's "self-serving interpretation of the video does not create a material dispute of fact" and that the Court should "view the facts in the light depicted by the videotape."  Response at 3.  Padilla's assertion does not specifically controvert Martin's factual assertion.  See D.N.M.LR-Civ. 56.1(b).  The Court's review of the video evidence reveals that Padilla threw Martin to the ground.  See Lapel Camera Videotape at 2:32-36 (Padilla).

[8]Padilla charged Martin with driving under the influence of intoxicating liquor or drugs, a misdemeanor offense in Martin's case.  See Albuquerque Police department DWI Offense Report (dated April 25, 2014), filed May 4, 2015 (Doc. 31-1)("Police Report"); NMSA § 66-8-102.  He also charged Martin with violations of two traffic laws: (i) entering a stop or yield intersection without stopping, see NMSA § 66-7-330; and (ii) [?] disobedience to police, see NMSA § 66-7-4 (directing persons to comply with lawful orders of police officers with authority to direct traffic).

Several hours later, after being released from the Metropolitan Detention Center, Martin went to Presbyterian Hospital to address his "testicular pain, discoloration and swelling." Response ¶ 8, at 4 (setting forth this fact).[9]  Later in the day, a doctor found that Martin's "left testicle was completely ruptured and consisted of dead tissue and surgically removed the testicle."  Response ¶ 9, at 4 (setting forth this fact).[10]  In June 2014, Martin visited a dermatologist to cure the abrasions on his face that he obtained when Padilla threw him onto the pavement.  See Response ¶ 10, at 4 (setting forth this fact).[11]  One month later, "the dermatologist performed a procedure to remove asphalt and other debris from under the skin on Mr. Martin's head and face."  Response ¶ 10, at 4 (setting forth this fact).[12]

## PROCEDURAL BACKGROUND

Martin filed his Complaint in the County of Bernalillo, Second Judicial District Court, State of New Mexico.  See Complaint at 1.  Martin alleges seven causes of action.  First, he asserts that Padilla's use of excessive force violates the Fourth Amendment to the Constitution of

---

[9]Padilla does not dispute this factual assertion.  He instead states that "there is no evidence that [Martin's injury] was caused by the Defendant."  The local rules require Padilla to "refer with particularity to those portions of the record" that dispute Martin's factual assertion. D.N.M.LR-Civ. 56(b).  Because Padilla does not specifically dispute this factual assertion or refer to the portions of the record that dispute the assertion, the Court deems it undisputed.  See D.N.M.LR-Civ. 56(b).

[10]Because Padilla does not specifically dispute this factual assertion or refer to the portions of the record that dispute the assertion, the Court deems it undisputed.  See D.N.M.LR-Civ. 56(b).

[11]Because Padilla does not specifically dispute this factual assertion or refer to the portions of the record that dispute the assertion, the Court deems it undisputed.  See D.N.M.LR-Civ. 56(b).

[12]Because Padilla does not specifically dispute this factual assertion or refer to the portions of the record that dispute the assertion, the Court deems it undisputed.  D.N.M.LR-Civ. 56(b).

the United States of America and 42 U.S.C. § 1983.  See Complaint ¶¶ 33-40, at 5-6.  Second, he alleges that Padilla committed a battery for which he can recover under the New Mexico Tort Claims Act, NMSA § 41-4-12.  See Complaint ¶¶ 41-47, at 5.  Third, he contends that the City of Albuquerque violated § 1983 when it "fostered a culture of violence and excessive force," "failed to properly train and supervise APD officers regarding the use of force," and failed to prevent "the culture of excessive force at APD, which caused Plaintiff's injury."  Complaint ¶¶ 49-59, at 6-7.  Fourth, Martin asserts that Padilla violated his rights to Due Process under the Fifth and Fourteenth Amendments to the Constitution of the United States.  See Complaint ¶¶ 60-65, at 7-8.  Fifth, Martin alleges a false arrest claim under the Fourth Amendment.  See Complaint ¶¶ 66-71, at 8.  Sixth, Martin contends that the City of Albuquerque's negligence led to Padilla's battery.  See Complaint ¶¶ 72-80, at 8-9.  Seventh, Martin asserts that Padilla "intentionally and in bad faith destroyed a video recording of his attack on the Plaintiff," thereby spoliating evidence.  Complaint ¶¶ 81-83, at 9.  He seeks relief other than a money judgment in addition to monetary relief exceeding $25,000.00.  See Court-Annexed Arbitration Certification, filed November 6, 2014 (Doc. 1-3).

The City of Albuquerque removed the case to federal court on November 6, 2014.  See Defendants' Notice of Removal, filed November 6, 2014 (Doc. 1)("Notice of Removal").  The City of Albuquerque asserts that, because the Complaint sets forth a claim arising under the Constitution and laws of the United States, the Court has original jurisdiction pursuant to 28 U.S.C. § 1331.  See Notice of Removal ¶ 4, at 1-2.  The City of Albuquerque answered Martin's Complaint on November 17, 2014.  See City's Answer at 1.  It denies the majority of the Complaint's allegations and asserts affirmative defenses.  See City's Answer at 8-12.  Padilla answered Martin's Complaint on November 24, 2014.  See Padilla's Answer.  Padilla denied the

majority of the Complaint's allegations and alleges affirmative defenses.  See Padilla's Answer at 7-9.

Padilla filed the Motion on April 10, 2015.  He seeks summary judgment under rule 56 of the Federal Rules of Civil Procedure for Martin's excessive-use-of-force claim in the Complaint's Count I.  See Motion at 1.  Padilla argues that he used reasonable force to arrest Martin because: (i) Martin admitted to "driving while intoxicated;" (ii) Martin failed to follow Padilla's commands, so he posed a safety risk to officers and drivers; and (iii) Martin "actively resisted being handcuffed and taken into custody."  Motion at 7.  Thus, Padilla argues that he used "only the amount of force needed to effectuate the arrest of the Plaintiff."  Motion at 7.

Martin responded to Padilla's Motion on April 24, 2015.  See Response at 1.  Martin maintains that Padilla is not entitled to qualified immunity because his "right to be free from excessive force was clearly established."  Response at 5.  He argues that he need not show "clearly established law that a severe strike to the genitals is unconstitutional, but only that unreasonable use of force was prohibited by law prior to the incident in question."  Response at 5.  Next, he asserts that Padilla's actions were not reasonable.  See Response at 5-6.  In the alternative, Martin urges the Court to "defer its ruling and allow the Plaintiff an opportunity to conduct discovery to further establish that Officer Padilla's actions were not reasonable."  Response at 7.

Padilla replied to Martin's Response on May 7, 2015.  See Defendant Padilla's Reply to Plaintiff's Response to his Motion for Summary Judgment Based on Qualified Immunity, filed May 7, 2015 (Doc. 33)("Reply").  Padilla maintains that his actions were "objectively reasonable," because a reasonable officer facing an "intoxicated, combative individual who was resisting arrest" could have concluded that the individual was unwilling to listen to anything he

had to say and that arresting him was necessary.  Reply at 5-6.  Moreover, Padilla contends that "there is no evidence that Defendant Padilla was attempting to inflict an injury on the Plaintiff." Response at 6.  Instead, he asserts that any contact with Martin's genitals was inadvertent.  <u>See</u> Reply at 6.  He contends that gross negligence is insufficient to trigger § 1983 liability.  <u>See</u> Reply at 6.  In response to Martin's request to stay the Motion, Padilla argues that the Court should stay a rule 56 motion only if the nonmovant shows that it "cannot present facts essential to justify its opposition."   Reply at 7.   Here, Padilla contends, Martin already responded to Padilla's Motion, so the Court should not grant a stay.  <u>See</u> Reply at 7-8.

The Court held a hearing on October 9, 2015.  It reviewed the video that Padilla recorded while arresting Martin.  Padilla emphasized that the video does not reveal any battery.  <u>See</u> Transcript of Hearing at 6:14-20 (Martinez)(taken October 9, 2010)("Tr.").[13]  Padilla conceded that, even if he had stricken Martin in the groin, the video would not reveal the strike, and therefore, is not conclusive evidence of whether the strike occurred.  <u>See</u> Tr. at 7:5-23 (Court, Martinez).  Consequently, Padilla conceded that the Court must rely on the affidavits.  Padilla "admitted that he gave him one knee strike," but that he was "not intending to harm the plaintiff."   Tr. at 6:2-3 (Martinez).   Padilla asserted that, although the Albuquerque Police Department does not train officers to knee people in the groin, it teaches police officers to use their knees to try to bring a person into control by making contact with the "meaty muscle in the inner thigh."   Tr. at 6:8-22 (Court, Martinez).   Padilla further admitted that it would be unreasonable and excessive if he intentionally struck Martin in the groin.  <u>See</u> Tr. at 10:4-9 (Court, Martinez).  Padilla argues that, at most, his knee strike could have been a "negligent

---

[13]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

application of a knee strike, but it's certainly not deliberate indifference and it's certainly not objectively unreasonable."  Tr. at 51:11-15 (Martinez).

Martin concedes that he was not being cooperative with Padilla's orders to sit down, but alleges that he did not fight Padilla, attempt to flee, or exhibit any signs of aggression.  See Tr. at 26:12-17 (Court, Loman).  Furthermore, he argues that driving while under the influence of alcohol is a nonviolent misdemeanor, and that "force is least justified against nonviolent misdemeanants, who do not flee or actively resist arrest."  Tr. at 35:14-36:1 (Loman).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting) (emphasis in original).[14]  Once the movant meets this burden, rule 56 requires the nonmoving

---

[14]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123

JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue -- whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty

- 11 -

Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[15]] explained that the

---

[15]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that Rhoads v. Miller, Lobozzo v. Colorado Department of Corrections, 429 F. App'x 707, 710 (10th Cir. 2011), Teigen v. Renfrow, 511 F.3d 1072 (10th Cir. 2007), and McCrary v. Aurora Public Schools, 57 F. App'x 362 (10th Cir. 2003) have persuasive value with respect to

blatant contradictions of the record must be supported by more than other witnesses' testimony[.]"   Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010) (Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92). In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th

---

material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## <u>THE IMPORTANCE OF TRIALS</u>

The Court was disappointed when a recent clerkship applicant opened his cover letter by pointing to a recent article in The New Yorker quoting the Honorable Shira Scheindlin, United States District Judge for the Southern District of New York, as saying: "I don't love trials. They are not a good way to tell a story."  Jeffrey Toobin, <u>Rights and Wrongs</u>, THE NEW YORKER (May 27, 2013), <u>available at</u> http://www.newyorker.com/magazine/2013/05/27/rights-and-wrongs-2. She went on: "What I really like to do is write opinions.  There you get to do what you think is right, what you believe in.  You're pushing the margins of the envelope, being willing to be creative."  <u>Id.</u>  The law clerk applicant then said that Judge Scheindlin "has nicely summed up" his "own view of being a litigator."  The applicant stated: "It is the briefs, and not the trials, that make me tick.  I'm applying to your chambers because the opportunities to tell good stories are rare in my current job -- as are the opportunities for 'pushing the margins of the envelope.'"

It is troubling that a trial judge does not like trials.  If the nation's trial judges do not like or believe in trials, how do we expect the people to accept trials?  The American judicial system is built on the premise that the trial is the best truth-seeking mechanisms ever devised.  Thomas Jefferson explained the importance of trial to Thomas Paine, saying: "I consider [trial by jury] as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution."  Thomas Jefferson to Thomas Paine, July 11, 1789.

Judge Scheindlin complains that trials "are not efficient."  That thought is hardly original.

Edson Sunderland -- a prolific writer who authored more than 130 articles on legal issues --

explained in 1915:

> [T]he people and the courts in most American jurisdictions have departed from the
> common law practice and have introduced a principle calculated to undermine the very
> institution which they wish to strengthen.  That is to say, through the rules prohibiting
> judges from commenting on the weights of the evidence, juries tend to become
> irresponsible, verdicts tend to become matters of chance, and the intricacy of procedure,
> with its cost, delay and liability to error, has increased so much as to threatened popular
> respect for courts of justice.

Edson R. Sunderland, The Inefficiency of the American Jury, 13 MICH. L. REV. 302, 302 (1915).

But the idea that our judicial system is not efficient has not always been considered a criticism.

In Federalist Paper 78, Alexander Hamilton noted that "the independence of the judges may be

essential safeguard against the effects of occasional ill humors in the society."  THE FEDERALIST

NO. 78 (Alexander Hamilton).   That the judiciary is deliberative, perhaps slowing down an

overheated political process and carefully reviewing the political branches' decisions, is a good

thing.

Also, when people say that they do not like trials, they are probably including jury trials.

Such modern criticism is contrary to the praise that the Founders had of trials, especially jury

trials.  They considered juries a bulwark of our liberty. As the Court concluded in United States

v. Courtney:

> The Court concludes that, the Supreme Court and especially Tenth Circuit
> precedent allowing the jury to know about sentencing ramifications only if its
> participation in sentencing is required, and precedent preventing the jury from
> learning about its nullification right, are inconsistent with trial practices at the
> Founders' time, and that these practices have eroded the Sixth Amendment jury
> trial right as the Farmers understood that right.

United States v. Courtney, 960 F. Supp. 2d 1152, 1154 (D.N.M. 2013)(Browning, J.).

A criticism of trials as inefficient is an elitist viewpoint.  Instead of seeing trials as one of the most democratic things the United States of America does, week after week, across the country, the elite see juries as a roadblock, hurdle, or speed bump in the elites' narrative of how things ought to be.  Ask any criminal defendant how he views the jury after the press, cable television, and talk radio have already convicted him, and the accused's viewpoint will likely differ from those of the elite.  Juries are messy.  They get in the way of the elites' narrative and expose weakness in the elite's storyline.

Judge Scheindlin says that trials are not a good way to tell a story.  Again, without a trial, there would likely be no cross-examination.  Cross-examination has been called, appropriately so, "the greatest legal engine ever invented for the discovery of truth."  5 J. Wigmore, EVIDENCE § 1367 (3d ed. 1940).  Without trials and cross-examination, the search for the truth would be severely compromised. Again, the purpose of the judiciary is not to tell good stories that the elite want the nation to hear; the purpose of trials is to find the truth, and to allow the jury -- the people -- to find the truth.  The process -- not just the end result -- is important to how this story ends, to how the public accepts the end of the story, and to how the nation or community decides the appearance of justice has been satisfied.  Getting the answer is only one-half of the district court's task.  The other half is to uphold the appearance of justice.

Judge Scheindlin says that trials are often tedious.  There are times trials are tedious for judges and juries.  It is less likely that they are tedious for the litigants for whom, in most cases, the trial is all about.  Trials are often tedious for judges at times because judges have seen it one-hundred or more times.[16]  The judge often knows what is going to happen and how it will happen.  The Court played football through college and then became a litigator; even though the

---

[16]The Court completed its 111th trial in October 2015.

Court has seen countless football games, which can be tedious at times, it never has found an entire game tedious.  It always delights the Court when every football pundit predicts the game's outcome with absolute certainty, and then the game surprises everyone.  This is the reason to play the game rather than just vote on the game.  The Court experiences the same excitement about trials.  It enjoys voir dire, talking to lay people, and watching the lawyers pick a fair and impartial jury.  It enjoys listening to the lawyers argue the case to the jury and watching how they deal with the weaknesses in their case.  The Court always enjoys cross-examination and seeing how the lawyers go about their craft.  The Court even enjoys retrials, because after a mistrial it likes to see how the lawyers adjust.  The Court thinks it is almost mystical when the juries come together and unanimously give verdicts after a difficult trial.  The Court enjoys the finality of verdicts: parties can quit obsessing over the dispute and move on.  Importantly, the constant fear of committing reversible error also keeps the Court engaged, preventing boredom.  Games and trials may have their tedious moments for judges, but there is plenty of excitement in both for spectators and judges to love them.

Trials can be tedious for juries at times, but for different reasons.  Many jurors have not seen a trial from beginning to end, so the newness of everything usually prevents boredom.  Jurors also have an important task: determining which story is true.  When they make that decision and they think that it is time to deliberate, they are done.  Juries usually get tired or frustrated when the lawyers -- oblivious to the jury's signal that they are toast -- beat points or arguments after the jury is ready to give its decision.  Good lawyers know how fast trials go on television, and they do not try to drag them out in real life.

Trials are not tedious for the lawyers.  Trials may be exhausting, but not tedious.  The lawyers have to stay alert and on their toes every second because the other side is always trying

to slip something in.  Trials are too difficult for trial lawyers to be tedious.  Thus, when people say trials are tedious, they may be saying that they are impatient with how the truth is discovered.  Trials are not a microwave oven.  Seeking the truth is hard work for everyone and is not for the faint of heart.

Judge Scheindlin says that what she really likes to do is write opinions: "There you get to do what you think is right, what you believe in.  You're pushing the margin of the envelope, being willing to be creative."  Toobin, supra.  There are times to write opinions, but there are also times to try cases.  The Court is concerned that qualified immunity, summary judgment, heightened pleading requirements, and the Sentencing Guidelines' hefty reward for acceptance of responsibility too often makes federal district judges opinion writers than trial judges.  The Court is not convinced that development is entirely good for the nation.  Trials -- especially those that include juries -- might send louder and mere definitive messages to society than judges' opinions, particularly trial judges' opinions.

Judge Scheindlin says that she likes to write opinions because "you get to do what you think is right . . . ."  Toobin, supra.  It is unclear, however, why getting the law right and giving it to a jury in a jury instruction is not doing what is right, too.  Nothing is more democratic than what happens in federal courtrooms all across the country each day -- putting aside the professionals for a moment, summoning to court the citizens, and having lay people apply the law that the political branches have passed, signed, enacted, and enforced, to the facts of the case.  That process is very special.  Anyone who has conducted voir dire and taken a verdict in the United States District Court for the District of New Mexico has felt the almost transcendent process of people coming from all across the fifth largest state in the union in terms of land, from twenty-one pueblos and four reservations, and a mixture of cultures, from all social-economic

backgrounds, some single, some married, some gay, some straight, some conservative, some liberal, some religious, some atheist or agnostic, to congregate for a few days, and become a group of citizens who make a decision -- unanimously -- about an issue of federal law.   In contrast to a United States Congress that struggles to agree by fifty-one percent on many issues, what juries do unanimously, day after day, is truly remarkable.  In a democracy, what the people say as a jury should mean more -- say more -- than what an unelected district court judge says in his or her opinion.  In a Fourth Amendment case, despite the ways judges dress it up in a lengthy jury instruction, the Court basically hands a copy of the Bill of Rights to the jury and asks: "What is reasonable?  What is excessive?"  In a democratic society, it should not be as important what a district judge believes as what the elected officials believe and enact, and what the citizens, in their jury verdicts, decide.

Judge Scheindlin states that, when she is writing opinions, "[y]ou're pushing the margins of the envelope, being willing to be creative."  Toobin, supra.  In the United States, a democratic society, the federal courts have often caused more problems than helped when they have been creative and pushed the margins of the envelope.  The Italian Renaissance painter Giotto di Bondone was asked to paint little squares on the side of altars in Florence.  If he had found that job tedious or unfulfilling, we might now have gotten some of the most beautiful paintings from the Italian Renaissance, including The Virgin and Child Enthroned with Angels (circa 1306-1310).   The cy pres doctrine is an example of judges pushing the envelope.  As the Court explained in In re Thornburg Mortgage, Inc. Securities Litigation: "Courts resort to cy pres where funds remain after distributing a class award and the court wishes to avoid (i) returning the funds to a defendant who has been found liable, or agreed it was liable, in that amount; and (ii) increasing the pro-rata share of the class members who file claims, potentially giving those class

members a windfall."  885 F. Supp. 2d 1097, at 1106 (D.N.M. 2012)(Browning, J.).  Similarly, "In the context of a class action, a court may employ the cy pres doctrine to "put the unclaimed fund to its next best compensation use, <u>e.g.</u>, for the aggregate, indirect, prospective benefit of the class."  <u>Masters v. Wilhelmina Model Agency, Inc.</u>, 473 F.3d 423, 436 (2d Cir. (2007).  The Court disagreed with the cy pres doctrine,

> for several reasons:  (i) class actions are disputes between parties and the money damages should remain among the parties, rather than be distributed to some third party; (ii) it is unseemly for judges to engage in the selection of third-party beneficiaries and to distribute class action damages to third parties; (iii) judges are often not in the best position to choose a charitable organization that would best approximate the unpaid class members' interests; and (iv) the doctrine encourages charitable organizations, and plaintiffs' lawyers, to lobby the court for cy pres awards.

<u>In re Thornburg Mortgage, Inc. Securities Litigation</u>, 885 F. Supp. 2d at 1106-1107.  The cy pres doctrine is an example of the potential harms that can be brought about by judges being creative and pushing envelopes.

While a federal judge's role in that republican form of government is very important, and can be personally very fulfilling from a career standpoint, when the judge begins to depart from his or her role, it can cause problems.  A federal judge must be careful, cautious and conservative.  Jeffrey Toobin has said of Judge Scheindlin: "Scheindlin's dedication to protecting citizen's rights is beyond question; it is less clear that she has the wisdom, or even the ability, to impose her vision in the real world of New York."  Toobin, <u>supra</u>, at 15.  As smart as any federal judge may be, in a democratic society, judges largely lack the wisdom of the collective and the ability of many in an increasingly complex society, and should be hesitant to impose their vision of the world on their community.  In a republic, that task is appropriately left to the majoritarian processes of the electoral system, circumscribed, of course, by the guarantees of the Constitution.

**LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER
42 U.S.C. § 1983**

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights." (quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006))). The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983. See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is

inapplicable to Bivens[17] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011) (Browning, J.)(citing Monell, 436 U.S. at 689).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

      **1.**        **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."

---

[17]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

Jojola v. Chavez, 55 F.3d at 493.  Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

The Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"  Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmondson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted) (quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.    Individual Liability.

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have

known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell, 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations.  The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).[18]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the

---

[18]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit."  41 F. Supp. 3d at 1273.

> 'philosophic' or but-for sense by the illegal entry." 72 F.3d at 400.  In civil rights
> cases, a superseding cause, as we traditionally understand it in tort law, relieves a
> defendant of liability.  See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d
> 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987),
> abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701
> (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment,

the Tenth Circuit has held that government actors "may be held liable if the further unlawful

detention and arrest would not have occurred but for their conduct and if there were no

unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at

1255.  The Tenth Circuit gave an example of a superseding-intervening cause, quoting the

Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of

Appeals for the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an
> arrest warrant and that they improperly enter without knocking and announcing
> their presence.  Once inside, they encounter the suspect, identify themselves,
> show him the warrant, and tell him that they are placing him under arrest.  The
> suspect, however, breaks away, shoots and kills two of the officers, and is
> preparing to shoot the third officer when that officer disarms the suspect and in
> the process injures him.  Is the third officer necessarily liable for the harm caused
> to the suspect on the theory that the illegal entry without knocking and
> announcing rendered any subsequent use of force unlawful?  The obvious answer
> is "no."  The suspect's conduct would constitute a "superseding" cause, see
> Restatement (Second) of Torts § 442 (1965), that would limit the officer's
> liability.  See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting WILLIAM

LLOYD PROSSER ET AL., PROSSER AND KEETON ON TORTS § 44, at 303-04 (5th ed.1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in
> determining whether the intervening act relieves the actor from liability for his
> antecedent wrongful act, and under the undisputed facts there is room for

reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing RESTATEMENT (SECOND) OF TORTS § 453 cmt.b (1965)).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economu, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the

plaintiff's claim, even though novel or otherwise unsettled, in fact has merit. Camreta v. Green, 131 S. Ct. 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001).  When a defendant asserts qualified immunity, the plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

**1.      Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the

defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's precedent and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases;" (ii) "it appears that the question will soon be decided by a higher court;" (iii) deciding the constitutional question requires "an uncertain interpretation of state law;" (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify;" (v) tackling the first element "may create a

risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question, because "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d at 1180-81 (quoting Pearson v. Callahan, 555 U.S. at 236-42).

Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern where guidance on the constitutionality of the challenged conduct is necessary and the conduct is only likely to face challenges in the qualified immunity context. See Camreta v. Greene, 131 S. Ct. at 2031-32. See Kerns v. Bader, 663 F.3d at 1181.[19]

_____

[19]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights, and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, exception that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added). The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violation where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S. Ct. at 2080 (quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones."). Cf. Glover v. Gartman, No. CIV 11-0752 JB/LAM, 2012 WL 4950756, at *30 n.5 (D.N.M. Sept. 27,

---

constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.).

2012)(Browning, J.)(expressing concern regarding Justice Elena Kagan's comments about "large" and "small" cases, and noting that, as a trial court judge, the Court must both find the law and facts correctly and accurately, but must also give its attention and time to each litigant before the Court).[20]   The Tenth Circuit will remand a case to the district court for further consideration

_____

[20]In <u>Kerns v. Board of Commissioners</u>, 888 F. Supp. 2d 1176 (D.N.M. 2012)(Browning, J.), the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

> While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in <u>Camreta v. Greene</u> about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

> If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) <u>Reichle v. Howards</u>, 132 S. Ct. 2088 (2012); (ii) <u>Filarksy v. Delia</u>, 132 S. Ct. 1657 (2012); and (iii) <u>Messerschmidt v. Millender</u>, 132 S. Ct. 1235 (2012).  In <u>Reichle v. Howards</u>, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice

when the district court has given cursory treatment to the qualified immunity issue.  See Kerns v. Bader, 663 F.3d at 1182.

> ### 2.      Clearly Established Rights in the Qualified Immunity Analysis.

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

---

President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

888 F. Supp. 2d at 1222 n.35.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The

general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs," as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." Kerns v. Bader, 663 F.3d at 1183 (emphasis added). Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established. See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law." Casey v. City of Fed. Heights, 509 F.3d at 1284. Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## RELEVANT LAW REGARDING EXCESSIVE FORCE

When an officer moves for qualified immunity on an excessive force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." Cortez v. McCauley, 478 F.3d at 1128. Accord Mata v. City of Farmington, 791 F. Supp. 2d 1118, 1137-38 (D.N.M. 2011)(Browning, J.). An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Graham v. Connor, 490 U.S. at 394. The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard. See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."). The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 397. Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. at 205. A court must judge the reasonableness of a particular use of force from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . That perspective includes an examination of the information possessed by the [officers]." Weigel v. Broad, 544 F.3d 1143, 1152 (10th Cir. 2008)(citations omitted)(internal quotation marks omitted).

1.    **Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable in the Qualified Immunity Context.**

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable.

> These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d at 1260.  In Weigel v. Broad, the Tenth Circuit also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  A court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and [must] pay careful attention to the facts and circumstances of the particular case."  Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).  Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S. at 396.

Case law need not establish that the exact police procedure at issue is unreasonable for a district court to conclude that it violated the Fourth Amendment.  In Weigel v. Broad, two police officers accidentally caused the death of a suspect by using excessive force in arresting and handcuffing him.  The suspect was non-cooperative, disobeying the officers' commands and attempting to flee.  See 544 F.3d at 1148.  To gain control of the suspect, one officer tackled him

- 38 -

and wrestled him to the ground.  See 544 F.3d at 1148.  The suspect vigorously resisted, repeatedly attempting to take the officers' weapons and evade handcuffing.  See 544 F.3d at 1148.  The officer put the suspect in a choke hold, handcuffed him, lay across his legs, and applied weight to his upper torso.  See 544 F.3d at 1148.  After several minutes, the suspect went into full cardiac arrest and died.  See 544 F.3d at 1149.

The Tenth Circuit held that the district court should not have granted summary judgment for the officers on qualified immunity grounds.  It reasoned that whether the officers' actions were reasonable was a jury question, because there was evidence that a reasonable officer would have known that: (i) the pressure created a risk of asphyxiation; and (ii) the pressure was unnecessary to restrain the suspect.  See 544 F.3d at 1152-53.  Accordingly, a reasonable jury could have concluded that an objectively reasonable officer would not have continued to apply force.  See 544 F.3d at 1149-50.  "If true, this constitutes an unreasonable use of force under the Fourth Amendment."  544 F.3d at 1153 (citing Gutierrez v. City of San Antonio, 139 F.3d 441, 449 (5th Cir. 1998)(concluding that a "material dispute of fact exists as to whether Gutierrez posed a threat of death or serious bodily injury to the officers or to others")).

In determining whether the law was clearly established, the district court in Weigel v. Broad held that the law was not clearly established, because the restraint which the officers used was different from restraints that the Tenth Circuit had previously held unreasonable.  See 544 F.3d at 1154.  Rejecting the district court's conclusion, the Tenth Circuit noted that "our analysis in this case of the constitutionality of the restraint" does not require "a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself."  544 F.3d at 1154.  Instead, the analysis relies "on more general principles."  544 F.3d at 1154.

Accordingly, the Tenth Circuit found that the law was settled: using any kind of restraints that seriously risked death or injury when the restraints are not necessary is unreasonable.  See 544 F.3d at 1154.

Similarly, the Tenth Circuit has made clear that, although officers may use force to apprehend a suspect, the level of force they use must be necessary to accomplish their objectives. See Buck v. City of Albuquerque, 549 F.3d 1269, 1289-90 (10th Cir. 2008).  Accordingly, officers may use more force to apprehend a fleeing felon than they may use to arrest a submissive misdemeanant.  See Casey v. City of Fed. Heights, 509 F.3d at 1282.  In Buck v. City of Albuquerque, the Tenth Circuit concluded that, when a suspect was charged with only a misdemeanor and was not fleeing, a reasonable jury could find that the officer's acts of grabbing the suspect, dragging him, pushing him face down onto the pavement, and kneeing him in the back were unreasonable.  See 549 F.3d at 1289.  Even when a suspect attempted to flee, the Tenth Circuit held that his flight did not justify the officer's kicks in the back and push forward into the pavement.  See 549 F.3d at 1190.

Regarding whether the law was clearly established, the Tenth Circuit stated that "an officer's violation of the Graham reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was legitimate justification for acting as she did."  Buck v. City of Albuquerque, 549 F.3d at 1291 (quoting Casey v. City of Fed. Heights, 509 F.3d at 1286).  Because "each factor in Graham counseled against the use of a large amount of force" against the suspects, the Tenth Circuit had "little difficulty in holding that the law was clearly established."  Buck v. City of Albuquerque, 549 F.3d at 1291.

Courts have specifically addressed whether groin strikes are unreasonable. For example, in Johnson v. District of Columbia, 528 F.3d 969 (D.C. Cir. 2008), the United States Court of Appeals for the District of Columbia held that a reasonable officer would have known that striking the suspect's groin was dangerous and that it was unnecessary to subdue the suspect. See 528 U.S. at 974-75. Regarding whether the officer new that a groin strike was dangerous, the D.C. Circuit stated: "Striking the groin is the classic example of fighting dirty. From the schoolyard scrapper to the champion prizefighter, no pugilist takes lightly the threat of a hit below the belt." 528 U.S. at 974-75. In short, the D.C. Circuit stated that a groin kick was a "serious intrusion" onto the suspect's Fourth Amendment interests. 528 U.S. at 974-75. Regarding whether the force was necessary, the D.C. Circuit acknowledged that officers may need to use more force in some situations, but that a "kick to the groin tends toward the vicious end of the scale." 528 U.S. at 975. In other words, officers should use groin kicks only when presented with extreme resistance and danger. Finally, the D.C. Circuit found that the officer's countervailing "weighty" interests in "apprehending an armed suspect and protecting himself and the public from possible harm" did not outweigh the suspect's Fourth Amendment interests. 528 U.S. at 975.

2.     **Least- or Less-forceful Alternatives in Excessive-Force Cases.**

"To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham v. Connor." James v. Chavez, No. CIV 09-0540, 2011 WL 5822726, at *17 (D.N.M. Nov. 9, 2011)(Browning, J.). The Fourth Amendment requires only that the defendant officers choose a "reasonable" method to end the

threat that the plaintiff poses to the officers in a force situation, regardless of the availability of less intrusive alternatives.  Graham v. Connor, 490 U.S. at 397.

In Michigan Department of State Police v. Sitz, 496 U.S. 444 (1990), the Supreme Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger.  Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

496 U.S. at 453-54.  See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of any particular government activity does not necessarily turn on the existence of alternative 'less intrusive' means.").  "To avoid unrealistic second guessing, the Fourth Amendment does not require that an officer use the least-intrusive alternative available to protect himself or others so long as the method chosen is reasonable."  Tanner v. San Juan Sheriff's Office, 864 F. Supp. 2d 1090, 1115 (D.N.M. 2012)(Browning, J.).

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the stop of a suspected drug courier in an airport under Terry v. Ohio.  The Supreme Court rejected Sokolow's contention that the arresting officers were "obligated to use the least intrusive means available to dispel their suspicions that he was smuggling narcotics."  490 U.S. at 11.  Instead, the Supreme Court stated: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques.  Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing."  United States v. Sokolow, 490 U.S. at 11 (internal quotation

marks omitted)(citations omitted).  Similarly, in United States v. Sharpe, 470 U.S. 675, 686-87

(1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost
> always imagine some alternative means by which the objectives of police might
> have been accomplished.  But "[t]he fact that the protection of the public might, in
> the abstract, have been accomplished by less intrusive means does not, by itself,
> render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit

disagreed with the plaintiff's contention that expert testimony about when a police dog's use is

objectively reasonable and about how defendant Lehocky's actions violated "well established

law enforcement standards . . . should have been admitted since it would have been helpful to the

jury in determining whether Lehocky used a reasonable amount of force."  399 F.3d at 1222.  In

so holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not
> require [police] to use the least intrusive means in the course of a detention, only
> reasonable ones."  United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th
> Cir. 1994).  Similarly, "violations of state law and police procedure generally do
> not give rise to a 1983 claim" for excessive force.  Romero v. Bd. of County
> Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995); see also Wilson v. Meeks, 52 F.3d
> 1547, 1554 (10th Cir. 1995)(holding that "violation of a police department
> regulation is insufficient for liability under section 1983" for excessive force)[,
> abrogated on other grounds by Saucier v. Katz, 533 U.S. at 205].  Both of these
> principles of our Fourth Amendment jurisprudence stem from the proper
> perspective from which to evaluate the conduct of a police officer -- that "of a
> reasonable officer on the scene, acknowledging that the officer may be forced to
> make split-second judgments in certain difficult circumstances."  Olsen [v. Layton
> Hills Mall], 312 F.3d [1304,] 1314 [ (10th Cir. 2002)].  Together, they prevent the
> courts from engaging in "unrealistic second guessing of police officer's
> decisions."  [United States v.] Melendez-Garcia, 28 F.3d at 1052.

> Here, the only issue before the jury was whether Lehocky acted as a
> "reasonable officer" when he ordered his police dog to apprehend Marquez.  In
> making this determination, the issues of whether Lehocky used the minimum
> amount of force to apprehend Marquez and whether Lehocky violated some "well
> established police procedure" are only tangentially related.  This is because even

> if it found Lehocky used more than the minimum amount of force necessary and
> violated police procedure, the jury could nonetheless find he acted reasonably.
> [United States v.] Melendez-Garcia, 28 F.3d at 1052; Romero [v. Bd. of Cnty.
> Comm'rs, 60 F.3d at 705].

Marquez v. City of Albuquerque, 399 F.3d at 1222.

In United States v. Melendez-Garcia, the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only reasonable ones."  28 F.3d at 1052 (internal quotation marks omitted).  See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . . Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases.  The only test is whether what the police officers actually did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as

the use of force is reasonable under Tennessee v. Garner [471 U.S. 1 (1985)] and Graham v. Connor.").

"Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative." Jonas v. Bd. of Comm'rs, 699 F. Supp. 2d 1284, 1296 (D.N.M. 2010)(Browning, J.). See, e.g., Blossom v. Yarbrough, 429 F.3d at 968 ("It is well settled that 'the reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury." (quoting Medina v. Cram, 252 F.3d at 1133)); Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in police-shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable). See also Roy v. Inhabitants of the City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); Diaz v. Salazar, 924 F. Supp. 1088, 1100 (D.N.M. 1996)(Hansen, J.). Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means." Illinois v. Lafayette, 462 U.S. 640, 647-48 (1983). The Court has also rejected the consideration of a less intrusive alternative to end a threat. See Jonas v. Bd. of Comm'rs, 699 F. Supp. 2d at 1293 ("To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least-, or even a less-, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable."); Chamberlin v. City of Albuquerque, No. CIV 02-0603 JB/ACT, 2005 WL 2313527, at *2 (D.N.M. July 31, 2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

## ANALYSIS

The parties dispute whether Padilla struck Martin in the groin and whether Padilla's actions were necessary to take Martin into custody. Because a material fact remains in dispute, the Court cannot properly grant summary judgment. Additionally, reading the facts in the light most favorable to Martin, the law was clearly established that striking a non-violent, although uncooperative, misdemeanant in the groin when he did not attempt to flee constitutes an excessive use of force. Consequently, the Court cannot properly grant summary judgment and denies Padilla's Motion in whole.

## I.     A MATERIAL DISPUTE EXISTS, SO THE COURT CANNOT CONCLUDE THAT PADILLA'S ACTIONS WERE REASONABLE AS A MATTER OF LAW.

There is a material issue of disputed fact whether Padilla used excessive force in arresting Martin. Under the Fourth Amendment, Martin had a right to be free from the excessive use of force. See Graham v. Conner, 490 U.S. 386, 388 (1989). Courts analyze whether an officer's use of force was excessive by asking whether it was "objectively reasonable" in light of the facts and circumstances confronting the officer, without regard to the officer's underlying intent. Graham v. Conner, 490 U.S. at 388. See Marquez v. City of Albuquerque, 399 F.3d 1216, 1220 (10th Cir. 2005); Austin v. Hamilton, 945 F.2d 1155, 1160 (10th Cir. 1991). A court "assesses the reasonableness of a Defendant's conduct from the perspective of a reasonable Defendant on the scene, acknowledging that the Defendant may be forced to make split-second judgments in certain difficult circumstances." Buck v. City of Albuquerque, 549 F.3d at 1287-88.

Before the jury can determine whether Padilla's use of force was reasonable, however, it must determine whether Padilla struck Martin in the groin. A knee strike to the thigh might be

reasonable, while a strike to the groin could be unreasonable.[21]   The parties dispute whether Padilla struck Martin's groin.  See Tr. at 7:2-4 (Martinez)("Padilla isn't admitting that he made any contact with the plaintiff's genital area.").  This denial puts a material issue in dispute. There are facts supporting a finding that Padilla struck Martin in the groin, and there are facts supporting that he did not.  Finding facts in the light most favorable to the nonmovant, the Court cannot properly determine that Padilla did not strike Martin in the groin.  The video does not provide conclusive evidence, leaving the Court to rely on the affidavits.  "Questions that turn on what facts are deemed more important are the very questions that a jury -- and not an unelected judge -- should answer."   Dorato v. Smith, 2015 WL 3540363, at *68 (D.N.M. May 26, 2015)(Browning, J.).

Moreover, the question whether Padilla's use of force was unreasonable also presents a question of fact for the jury.  See Draeger v. Grand Central, Inc., 504 F.2d 142, 144 (10th Cir. 1974)(noting that a dispute whether an officer acted reasonably is a fact question).  In Weigel v. Broad, the Tenth Circuit held that applying weight to a suspect's torso is dangerous, but not always unreasonable.  The officers' use of force was unreasonable under the case's facts because there was evidence that: (i) a reasonable officer would have known the pressure was excessive; and (ii) a reasonable officer would have known that the pressure was unnecessary to subdue the suspect.  See 544 F.3d at 1149-50.  The same situation is true here.  Administering knee strikes may not always be unreasonable.  See Myser v. Spokane Cnty., 2008 WL 4833294, at *8 (administering knee strikes to a belligerent and aggressive suspect's torso when the suspect refused to comply with the officer's orders, exhibited violent and aggressive behavior, and

---

[21]Myser v. Spokane Cnty., 2008 WL 4833294, at *8 (E.D. Wash. Nov. 3, 2008)("Although a knee strike does not constitute deadly force, it is intended to inflict pain and is capable of injuring an arrestee.  Thus, when feasible, a law enforcement officer should issue a warning before administering a knee strike.").

resisted arrest).  A jury could find it unreasonable here, however, where there is evidence that would lead a reasonable officer to conclude that striking the groin area: (i) creates serious risks of injury; and (ii) is unnecessary to subdue a suspect who exhibited no signs of violence and did not attempt to flee.

Knee strikes to other parts of a suspect's body are inherently dangerous, are intended to inflict severe pain, and are "capable of injuring an arrestee."  Myser v. Spokane Cnty., 2008 WL 4833294, at *8.  Knee strikes to a suspect's groin constitute an even greater danger.  As the D.C. Circuit found in Johnson v. District of Columbia, any reasonable officer would know that striking a suspect's groin poses a serious risk of injury.  See 528 U.S. at 974-75 (finding that, since childhood, people know that striking the groin is dangerous and that a groin strike constitutes a "serious intrusion" onto a suspect's Fourth Amendment interests).  Padilla admitted that intentionally striking a suspect's groin would be unreasonable.  See Tr. at 10:4-9 (Court, Martinez).  Furthermore, striking a suspect's groin with enough force to rupture a man's testicle constitutes an even greater risk of injury.

Second, viewing the facts in the light most favorable to Martin, a reasonable officer in Padilla's situation would know that the force was unnecessary to restrain Martin.  The Tenth Circuit consults three factors to determine an action's reasonableness: (i) the crime's severity; (ii) whether the suspect poses an immediate safety threat; and (iii) whether the suspect is actively resisting arrest or attempting to flee.  See Weigel v. Broad, 544 F.3d at 1151-52.  First, Padilla suspected Martin of committing a misdemeanor at most.  Padilla had not administered any sobriety tests and relied on Martin's statement that he had three beers over the course of several hours in deciding to arrest Martin.  Unlike the suspect in Weigel v. Broad -- who actively resisted and tried to grab the officers' weapons, see 544 F.3d at 1149-50 -- Martin did not fight

back or attempt to flee.  Although he was uncooperative in failing to sit down after Padilla's numerous initial requests, Martin eventually sat down and complied.  This situation is unlike the one in Myser v. Spokane County, where the officers had reason to believe the suspect had been violent with others, blatantly told the officers that he would not comply with their commands, and assumed an aggressive stance.  See 2008 WL 4833294, at *8.  Martin never told Padilla that he would not obey any of his commands.  Thus, while Martin was uncooperative, taking the facts and evidence in the light most favorable to Martin, he did not attempt to flee.

The record contains no evidence that Martin presented an imminent danger to Padilla or others that justified the use of extreme force.  Although Martin was driving after he consumed alcohol, the Tenth Circuit has concluded that a suspect who was driving wildly on the wrong side of the road while attempting to escape law enforcement did not pose an imminent threat to other motorists that justified the officer's use of force.  See Cordova v. Aragon, 569 F.3d 1183, 1192 (10th Cir. 2009)(O'Brien, J.).  The mere possibility that the suspect's behavior could endanger motorists who might come along was insufficient to justify shooting at the suspect.  See Cordova v. Aragon, 569 F.3d at 1190.  Here, Martin did not pose an imminent threat to Padilla or other motorists.  Padilla had evidence that Martin had consumed some alcohol, but Martin was not going anywhere.  See Tr. at 13:2-7 (Martinez).  Like in Cordova v. Aragon, no other drivers were around.  See 569 F.3d at 1190.  Martin exhibited no aggressive behavior, kept his hands in plain sight, and carried no weapons.  Thus, Martin posed no immediate safety threat.

Notably, Padilla did not inform Martin that he was under arrest before pushing him up against the truck and administering a knee strike, revealing that Padilla's strike could have been unnecessary.  See Casey v. City of Federal Heights, 509 F.3d at 1282 (noting that the officer's force could have been avoided because the officer never told the suspect he was under arrest and

gave him a chance to turn around).  "[A] reasonable officer should, at a minimum, have ordered [the suspect] to submit to an arrest or used minimal force to grab him while informing him that he was under arrest."  Casey v. City of Fed. Heights, 509 F.3d at 1282.  Padilla might have thought that Martin would not turn around and submit to an arrest.  Nonetheless, that Martin sat down and complied with Padilla's orders earlier demonstrates that he might have submitted to Padilla's commands to turn around because he was under arrest.

This case is distinct from Mecham v. Grazier, 500 F.3d 1200 (10th Cir. 2007), in which the Tenth Circuit concluded that an officer's use of force was permissible on an uncooperative suspect when the officer repeatedly threatened to arrest her if she did not comply with his orders, and the suspect also constituted a danger to herself and others.  See 500 F.3d 1200, 1204-06.  In contrast, Padilla never threatened to arrest Martin.  Repeatedly telling him to sit down is different from instructing him that failing to sit down will result in arrest.  An arrest carries a penalty that could threaten an uncooperative suspect into submission.  Moreover, unlike in Mecham v. Frazier, Martin posed no danger to Padilla or others in the way that the suspect did in Mecham v. Frazier.  Even if Padilla harbored doubts about whether Martin would submit to an arrest, these doubts may justify physically grabbing him and turning him around without a warning, but not pushing him with his back against the truck and striking him.  In sum, a reasonable jury could conclude that Padilla's alleged groin strike was not only dangerous, but unnecessary.

Additionally, a reasonable jury might find that Padilla's action of pushing Martin face-first into the ground was also unnecessary.  Where a suspect no longer poses a threat to the officer and does not resist his authority, violent force is unreasonable.  See Buck v. City of Albuquerque, 549 F.3d at 1289; Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1193 (concluding that, once a suspect submits to an officers' show of force, and the officer has no

reason to believe the person poses a danger, it may be excessive and unreasonable to aim a firearm at that person).  A reasonable jury could conclude that, after Padilla pushed Martin into the truck, Martin submitted to Padilla's authority and presented no threat.  His hands were already covering his groin and he was bent over in pain.  A reasonable jury could also find that, despite this, Padilla threw him face-first into the ground.  A reasonable jury could conclude that such an action was not necessary for Padilla to place Martin under arrest.

Finally, the government's interests do not greatly outweigh Martin's Fourth Amendment interests.  Although the government has an interest in preventing drunk drivers from staying on the road, this interest does not outweigh Martin's interest in being free from excessive use of force, especially when Padilla had little evidence to show that Martin was intoxicated.  This case is different from Johnson v. District of Columbia, where the government had an interest in apprehending an armed suspect and protecting the public from possible harm.  See 528 F.3d at 975.  "The question is whether the specific police behavior at issue -- here repeatedly kicking a surrendering suspect in the groin -- produces some law enforcement benefit that might outweigh the serious harm it causes."  Johnson v. District of Columbia, 528 F.3d at 975.  See Delaware v. Prouse, 440 U.S. 648, 659 (1979)("The question remains, however, whether in the service of these important ends the [method of seizure] is a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such [seizures] entail.").  The Tenth Circuit has stated that "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest."  Casey v. City of Fed. Heights, 509 F.3d at 1285.  A reasonable jury could conclude that Martin had, at most, potentially committed a misdemeanor of driving while under the influence.  Although not cooperative, Martin never attempted to flee or to draw a weapon, and a reasonable jury could find that Martin never exhibited signs of aggression or violence.  A

jury could conclude both that Padilla struck Martin in the groin and that using an advanced take-down procedure that could potentially rupture a man's testicle was unnecessary to arrest him.  A court should not grant summary judgment where a genuine factual dispute exists unless no reasonable jury could find in favor of the non-moving party.  See Peter Kiewit Sons Co. v. Clayton, 366 F.2d 551, 554 (10th Cir. 1966).  A reasonable jury could find that the level of force Padilla used was unreasonable.

The Court has noted the importance of allowing juries to make factual findings.  "This practice furthers the perception of justice that our society has of the judicial system."  Dorato v. Smith, 2015 WL 3540363, at *68.  In a case like this one, where a police officer's violent take-down procedure permanently injured a suspect, "society is not well served if an unelected judge makes the final determination behind closed doors."  Dorato v. Smith, 2015 WL 3540363, at *68.  Allowing a single judge to resolve factual questions that are best answered by a jury undermines the appearance of justice, which is often "as important as dispensing justice." United States v. Rodella, 2015 WL 711931, at *39 n.12 (D.N.M. Feb. 2, 2015)(Browning, J.). Particularly now, when scenes of police violence flood the news, courts should be reluctant to resolve factual issues.  When a police officer seriously injures an unarmed person, and there is a factual question whether the officer caused the injury, "society's faith in the justice system is undermined when an unelected judge declares -- as a matter of law -- that no reasonable jury could find" that the officer did or did not injure Martin, while at the same time refusing to test this declaration by presenting the case to a jury.  Dorato v. Smith, 2015 WL 3540363, at *68.

For these factual issues, the question should be presented -- in open court -- to a panel of jurors, ordinary citizens who can make the important factual determination.  See Dorato v. Smith, 2015 WL 3540363, at *68.  The Tenth Circuit's summary judgment standard highlights

the importance of juries, by permitting summary judgment only "if no reasonable jury viewing the evidence could return a verdict for the nonmoving party."   Saville v. Int'l Bus. Machines Corp., 188 F. App'x 667, 669 (10th Cir. 2006)(unpublished)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  The Court is not saying that Padilla violated constitutional rights or that a jury will find for Martin, but only that a jury should be the one to make that determination.  Were the Court to conclude that Padilla struck Martin's thigh, not his groin, it would be inconsistent with the basic tenets of summary judgment -- to view the evidence in a light most favorable to the nonmoving party and to draw all inferences in his or her favor.   Neither the Tenth Circuit nor the Supreme Court has held that, when considering a motion for summary judgment involving qualified immunity, a different summary judgment standard applies.  To the contrary, both have maintained that, even in the qualified immunity context, courts should still view all facts in a light most favorable to the nonmoving party.  See, e.g., Plumhoff v. Rickard, 134 S. Ct. 2012, 2017 (2014)("Because this case arises from the denial of the officers' motion for summary judgment, we view the facts in the light most favorable to the nonmoving party. . . ."); Puller v. Baca, 781 F.3d 1190, 1196 (10th Cir. 2015)("We review de novo a grant of summary judgment on the basis of qualified immunity.  We review the evidence in the light most favorable to the nonmoving party."  (citations omitted)(internal quotation marks omitted)).  Viewing the evidence in the light most favorable to Martin, the Court concludes that a reasonable jury could find that Padilla struck Martin in the groin, and that striking and pushing him to the ground were unreasonable under the circumstances.

## II.   THE LAW WAS CLEARLY ESTABLISHED AT THE TIME THAT PADILLA ARRESTED MARTIN.

As the Tenth Circuit stated in Weigel v. Broad, "our analysis in this case of the constitutionality" of Padilla's force does not require a "court decision with identical facts to

establish clearly that it is unreasonable to use" such force when the force is unnecessary to restrain a suspect to protect the public.  544 F.3d at 1154.  See Casey v. City of Fed. Heights, 509 F.3d at 1284 ("We cannot find qualified immunity wherever we have a new fact pattern."); Anderson v. Blake, 469 F.3d 910, 914 (10th Cir. 2006).  The issue is whether a reasonable officer could have believed that striking Martin in the groin and pushing him face-first into the ground when he posed neither a risk of flight nor violence was a lawful means of conducting a seizure under the Fourth Amendment.  See Casey v. City of Fed. Heights, 509 F.3d at 1285; Johnson v. District of Columbia, 528 U.S. at 975 (analyzing whether the law was clearly established that a police officer's kick to a suspect's groin was unreasonable).  If "officers of reasonable competence could disagree on this issue, immunity should be recognized."  Mally v. Briggs, 475 U.S. 335, 341 (1986).  See Saucier v. Katz, 533 U.S. at 203-07.

The law is clear that the level of force officers use must be necessary to accomplish the their objectives.  See Graham v. Connor, 490 U.S. at 396; United States v. Hensley, 469 U.S. 221, 235 (1985).  Specifically, Tenth Circuit law makes clear that extreme force -- like punching and kicking -- is not necessary when the suspect is accused of a minor offense and presents no risk of serious danger to the officer or the public.  See Cortez v. McCauley, 478 F.3d at 1125-26; Buck v. City of Albuquerque, 549 F.3d at 1290-91 (stating that "an officer's violation of the Graham reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was legitimate justification for acting as she did")(internal quotation marks and citation omitted); Casey v. City of Fed. Heights, 509 F.3d at 1282 (concluding that an officer's use of dangerous force -- including tackling, Tasering, and punching -- against a suspect accused of a misdemeanor, "who was neither violent nor attempting to flee," was unreasonable).

For minor offenses, "permissible force includes physical restraint, use of handcuffs, and pushing into walls." Brown v. City of Huntsville, Ala., 608 F.3d 724, 740 (11th Cir. 2010). See Cortez v. McCauley, 478 F.3d at 1126; Buck v. City of Albuquerque, 549 F.3d at 1290. The Tenth Circuit has held that, when a suspect accused of a serious felony presents no threat of danger to the officers conducting the arrest, "a small amount of force," like grabbing the suspect and placing him in the patrol car, is permissible. Cortez v. McCauley, 478 F.3d at 1128-29. In contrast, when a suspect faces only misdemeanor charges, does not attempt to flee, and does not threaten public safety, an officer's use of more force -- like dragging a suspect, pushing him face down onto the pavement, and kneeing him in the back -- is unreasonable. See Buck v. City of Albuquerque, 549 F.3d at 1290. Here, a reasonable jury could conclude that Padilla suspected that Martin had committed, at most, a misdemeanor offense. The law is clear that permissible force includes physical restraint and even pushing into the truck, but not physical blows and pushing face-first into the pavement -- especially before notifying the suspect he was under arrest and telling him to turn around. Striking and pushing a non-violent suspect who made no attempt to flee does not constitute "a small amount of force," analogous to grabbing the suspect and placing him in a patrol car. Cortez v. McCauley, 478 F.3d at 1128-29.

Moreover, a reasonable jury could find that Martin presented no threat of violence. A reasonable jury could find that he never resisted arrest because Padilla never gave him the chance; Padilla pushed and struck Martin without informing him that he was under arrest. When force is not necessary to advance governmental interests, the force is unreasonable. See Cortez v. McCauley, 478 3d at 1126; Casey v. City of Fed. Heights, 509 F.3d at 1285. The Court recognizes that Martin was uncooperative and that Padilla could have believed that some force was necessary to arrest Martin. Nonetheless, Tenth Circuit law makes clear that when a suspect

does not attempt to flee, poses no danger to the officer or the public, and is accused of only a misdemeanor, extreme force like striking and shoving to the ground is impermissible.  See Buck v. City of Albuquerque, 549 F.3d at 1291; Casey v. City of Fed. Heights, 509 F.3d at 1285. Martin's sheer failure to sit down would not lead a reasonable officer to conclude that a severe blow to the genitals was necessary to arrest him.  See Cortez v. McCauley, 478 F.3d at 1131. Accordingly, there were "no substantial grounds for a reasonable officer to conclude that there was legitimate justification for acting as she did."  Buck v. City of Albuquerque, 549 F.3d at 1291 (quoting Casey v. City of Fed. Heights, 509 F.3d at 1286).

In sum, a reasonable jury could conclude that Padilla struck Martin and pushed him face-first into the ground, even though Martin posed no threat of serious physical harm to Padilla or others that would warrant the force used.  "Considering that under [Martin's] version of events, each of the Graham factors lines up in his favor," the law is clearly established that Padilla could not use this level of force.  Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008).  Any reasonable officer in Padilla's shoes would have known that it was unlawful to use this level of force against a non-violent, albeit uncooperative, suspect.  Accordingly, the Court concludes that there is a genuine issue of material fact whether Padilla violated Martin's clearly established constitutional rights, and the Court will deny the Motion in whole.

**IT IS ORDERED** that Defendant Padilla's Motion for Summary Judgment Based on Qualified Immunity, filed April 10, 2015 (Doc. 25), is denied.

_____
UNITED STATES DISTRICT JUDGE

- 56 -

*Counsel:*

Eric Loman
Bregman & Loman, P.C.
Albuquerque, New Mexico

     *Attorney for the Plaintiff*

Jonlyn M. Martinez
Law Office of Jonlyn M. Martinez, LLC
Albuquerque, New Mexico

     *Attorney for Defendant Pablo Padilla*